## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PETROLEUM MARKETING GROUP, INC., | : : : |
| Plaintiff, | : : |
| v. | : : |
| SYED KAZMI, SHAMIKH KAZMI, UNIVERSAL PROPERTY SERVICES, INC., and UNIVERSAL GROUP COMPANY, INC. | : : : : : |
| Defendants. | : : |

CIVIL ACTION NO.:

## COMPLAINT

Plaintiff, Petroleum Marketing Group, Inc., for its Complaint, alleges the following:

## THE PARTIES

1. The Plaintiff is Petroleum Marketing Group, Inc. ("PMG" or "Plaintiff"). PMG is a Maryland corporation with a principal place of business in Virginia.

2. Defendant, Syed Kazmi ("Syed"), is an adult individual and is a citizen of and domiciled in New Jersey.

3. Defendant, Shamikh Kazmi ("Shamikh"), is an adult individual and is a citizen of and domiciled in New Jersey.

4. Defendant, Universal Property Services, Inc. ("Universal"), is a New Jersey corporation with a principal place of business in Allentown, New Jersey.

5. Defendant Universal Group Company, Inc. ("UGC"), is a Pennsylvania corporation with a registered office at 10960 Bustleton Avenue, Philadelphia, Pennsylvania.

6. Upon information and belief, Syed and Shamikh are officers, directors, and/or employees of UGC and Universal.

7. Upon information and belief, Syed and Shamikh treat UGC and Universal as alter egos without regard for any financial, legal, or operational distinctions or required separateness.

8. Upon information and belief, Syed and Shamikh are brothers. Syed and Shamikh are referred collectively to herein as the "Kazmi Brothers," and, with Universal and UGC, "Defendants."

<div align="center">

**JURISDICTION AND VENUE**

</div>

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332. There is diversity of citizenship between Plaintiff and Defendants. The amount in controversy exceeds $75,000.00 exclusive of interest and costs.

10. Venue is proper in this District and Court pursuant to 28 U.S.C. §1391. A substantial part of the events giving rise to the claims occurred in this District.

<div align="center">

**FACTUAL BACKGROUND**

*The Parties' Business and Credit Relationship*

</div>

11. PMG operates a fuel distribution company.

12. At times relevant to this action, Defendants have engaged in various businesses, including the resale of fuel which is purchased from multiple suppliers, including PMG, at all times relevant to this action.

13. In or about July 2020, Shamikh, on behalf of Universal, requested PMG to enter into a business arrangement to purchase fuel from PMG.

14. Shamikh and Universal's plan was to re-sell and/or distribute that fuel to Universal's customers or affiliated parties who operated gas stations in New Jersey and Pennsylvania.

15. Before PMG would agree to enter into such a business relationship with Universal, PMG required that Universal complete an Application for Commercial Credit ("Credit Application").

16. On or about July 21, 2020, Shamikh submitted—*via* interstate wires through electronic mail—a completed and fully executed Credit Application to PMG. This Credit Application is attached hereto as Exhibit "1."

17. The Credit Application identified Syed as the CEO and owner of Universal.

18. The Credit Application attached and incorporated an Agreement titled "Petroleum Marketing Group Account Conditions" ("Account Conditions Agreement"), which was executed by Syed. Ex. "1" at 2.

19. The Credit Application is in the name of Universal. Syed is the "Applicant" in the incorporated Account Conditions Agreement. *See* Ex. "1".

20. Based on and in reliance upon the representations in the Credit Application and Account Conditions Agreement, PMG extended credit to Universal for PMG's sale of fuel product to Universal.

21. The vast majority of the fuel product was to be drawn by Universal and/or its agents from fuel tanks located at Gulf Oil's Woodbury Terminal in West Deptford, New Jersey ("Gulf Terminal").

22. In connection with the Credit Application and this business relationship, PMG required that Universal execute an ACH Authorization Form, by which Universal authorized PMG

3

to draw, from a designated bank account, the amounts owed for the fuel purchased from PMG, including any fuel drawn from the Gulf Terminal.

23.     Syed executed and submitted an ACH Authorization Form for an M&T Bank account ("M&T Authorization") and an ACH Authorization Form for a TD Bank account ("TD Authorization").

24.     Both the M&T Authorization and the TD Authorization stated that the "authorization is to remain in full force and effect until 15 days after Petroleum Marketing Group or its assigns have received written notification from [Universal] of this termination."

25.     The M&T Authorization identifies the M&T Bank account as being controlled by Universal, but through discovery in an ongoing separate litigation pending in this Court (*i.e.*, the litigation identified herein at Paragraph 34, *infra*), PMG recently learned that the M&T Bank account is actually controlled by UGC.

26.     Defendants have been using the UGC M&T Bank account as an operating account, through which they receive payments from customers and make payments to vendors.

27.     Upon information and belief, as owners, officers and/or directors of UGC and Universal, Syed and Shamikh have used the corporate assets of UGC and Universal as if the assets were their own, thereby ignoring the separateness of each company as a distinct entity.

28.     Upon information and belief, as owners, officers and/or directors of UGC and Universal, Syed and Shamikh have paid personal expenses from the UGC M&T Bank account.

29.     Upon information and belief, Syed and Shamikh intermingle personal assets with the assets of UGC and Universal.

30.     In or around January 2021, PMG began drawing, from the UGC M&T Bank account, amounts that PMG was owed for the fuel Universal purchased on credit.

31.     In July 2021, the business relationship between PMG and Universal was terminated by mutual agreement. As a result, Universal and its agents had no authority or permission to draw or take any fuel from PMG at the Gulf Terminal.

32.     In August 2021, after Universal no longer had any right to enter the Gulf Terminal and draw fuel from PMG, PMG discovered that Universal and its trucker agents deceptively gained entrance and unlawfully stole thousands of gallons of PMG's fuel.  This series of thefts occurred over the course of 10 days until Universal got caught and the thefts were exposed.

33.     After discovering the theft and tracing it back to Universal, PMG demanded payment for the stolen fuel product.

34.     PMG filed a Civil Action Complaint, which is presently pending in this Court, alleging that Universal, Shamikh, and their trucking agents (*i.e.*, MR3 Logistics LLC and Orbit Freight Lines, LLC) engaged in an intentional tortious conversion scheme to steal the fuel from PMG, by deceptively gaining unlawful entry into the Gulf Terminal, removing fuel from tanks through their deceptive use of an unauthorized code, and transporting it out of the terminal for resale and profit. That civil action is captioned *Petroleum Marketing Group, Inc. v. Universal Property Services, et al.*, 3:30-cv-02410-GC-RLS (D.N.J.). That civil action is referred to herein as "the Conversion Litigation."

### *Defendants' Fraudulent Scheme*

35.     In December 2022, in the course of the Conversion Litigation, third-party discovery was obtained from certain lenders and banks doing business with Universal.  PMG discovered for the first time, that there were many materially false representations made to PMG on the aforesaid Credit Application and related documents (referenced in Paragraphs 15-26, *supra* and Exhibit "1").

36.    For example, the Credit Application requested disclosure of whether any owner of Universal was "a Guarantor for other loans or credit obligations."  In response, Syed represented, "No." Ex. "1" at 1.

37.    That representation was false.  Based on recent discovery in the Conversion Litigation, as of July 21, 2020, the date that Syed submitted the Credit Application, Syed was, in fact, a guarantor, in his individual capacity, pursuant to at least twenty-eight (28) other guaranty agreements relating to other loans or credit obligations.

38.    As recently discovered, Syed had executed guaranty agreements with multiple entities, including, but not limited to:

    a.  7-Eleven, Inc.;

    b.  M2 Lease Funds LLC;

    c.  Stearns Bank, N.A. (Syed executed at least two (2) guaranty agreements with Stearns Bank, N.A.);

    d.  Circle K Stores, Inc. (Syed executed at least seventeen (17) guaranty agreements with Circle K Stores, Inc.);

    e.  Full Circle Finance;

    f.  Sunbridge Leasing Corporation (Syed executed at least two (2) guaranty agreements with Sunbridge Leasing Corporation); and

    g.  NewLane Finance Company;

39.    Syed's signature appears on all of the guaranty agreements referenced in the preceding Paragraph.

40.    Thus, Syed's representation on the July 21, 2020 PMG Credit Application, that he was not a guarantor for other loans or credit obligations, was false.

41.    The PMG Credit Application also requested disclosure of whether any owners of Universal "ever had any judgments or state or federal tax liens filed against you?" In response, Syed again represented, "No." Ex. "1" at 1.

42.    That representation was false.  Based on recent discovery in the Conversion Litigation, as of July 21, 2020, the date that Syed submitted the Credit Application, there was, in fact, at least two (2) judgments against Syed, including, but not limited to, judgments in the following captioned cases:

      a.    *m2 Lease Funds LLC v. Universal Property Services, Inc., Aqri. Inc., and Syed M. Kazmi*, Waukesha County, Wisconsin Circuit Court, Case No. 20-CV-748 (judgment entered on July 7, 2020); and

      b.    *Jitendra Pujara v. Syed Kazmi*, Superior Court of New Jersey Law Division, Mercer County, Docket No. MER-L-000661-007 (judgment entered on February 6, 2009);

43.    Thus, Syed's representation on the July 21, 2020 PMG Credit Application, that no judgments had been entered against him, was false.

44.    The PMG Credit Application also requested disclosure of whether Syed "or any officers of the company [have] ever done business under another name and/or in a different state." In response, Syed again represented, "No." Ex. "1" at 1.

45.    That representation was false.  Based on recent discovery in the Conversion Litigation, as of July 21, 2020, Syed and/or Shamikh—who was an officer of Universal—did, in fact, own or serve as an officer for at least three (3) other companies, including, but not limited to:

      a.    KRSM, Inc.;

      b.    Diwan Petrol, Inc.; and

      c.    Aqri, Inc.

46.    Thus, Syed's representation on the July 21, 2020 PMG Credit Application, that neither he nor any other officer of Universal had conducted business under another name, was false.

47.    Additionally, Syed's representation, that neither he nor any other officer of Universal had conducted business in a different state, was false.  Based on recent discovery, Universal had, in fact, conducted business in Florida.  PMG has discovered that Syed is a named plaintiff in litigation in the District of New Jersey.  In that litigation, Syed has represented that he and Universal were conducting business in Florida as of the time he submitted the July 21, 2020 PMG Credit Application. *See Universal Property Services, Inc. and Syed Kazmi v. Lehigh Gas Wholesale Services, Inc. et al.*, District of New Jersey, Docket No. 3:20-cv-03315-GC-TJB.

48.    The Credit Application also requested Syed to identify two bank references.  In response, Syed identified Bank of America as a bank reference.

49.    Upon information and belief, that representation was false. During discovery in the Conversion Litigation, Plaintiff issued a Third-Party Document Subpoena pursuant to Rule 45 to Bank of America, requesting production of documents related to Universal, Syed, Shamikh, and the Bank of America bank account identified by Syed on the Credit Application. Bank of America responded that it could not locate any of the accounts or records identified in the Subpoena.

50.    Syed, with the knowing assistance and agreement of the other Defendants, made each of the aforementioned representations with knowledge that they were false.

51.    Syed made each of these representations knowing and intending that PMG would reasonably rely on the representations when deciding whether to conduct business with and extend credit to Universal.

52.    PMG relied on these representations, including by extending credit to Universal pursuant to the July 21, 2020 Credit Application and Account Conditions Agreement, and otherwise doing business with Universal.

53.    The foregoing misrepresentations were material to PMG. Had PMG known the truth concerning these representations, PMG would not have extended credit to Universal and would not have done business with Universal.

### *UGC Advances the Ongoing Fraudulent Scheme*

54.    The Account Conditions Agreement—which is incorporated into the Credit Application—provided that if Syed or Universal fail to make timely payments for PMG's fuel (including fuel drawn at the Gulf Terminal), PMG may terminate the credit privileges.  Ex. "1" at 2.

55.    In or around January 2021, Defendants began using UGC for making payments to PMG, through UGC's M&T Bank account.

56.    Based on UGC's payments and the M&T Authorization for PMG to automatically draw from UGC's account, PMG continued to extend credit to and do business with Syed and Universal.

57.    UGC knew the representations and material omissions made by Syed, Shamikh, and Universal were false, but did not disclose the truth to PMG.

58.    UGC's conduct and payments furthered the ongoing fraudulent scheme by enabling Defendants to continue the business and credit relationship with PMG.

59.    In August 2021, after PMG learned that Defendants had deceptively gained unlawful access to the Gulf Terminal and stole PMG's fuel, PMG attempted to recover payment by drawing funds from UGC's M&T Bank account, pursuant to the M&T Authorization.

9

60. In furtherance of Defendants' fraud and theft of PMG's fuel, Syed, on behalf of UGC, directed M&T Bank to block the draws, by falsely representing to M&T Bank, on different occasions, the following:

   a. that PMG was not authorized to draw the full amount ($667,516.86), and was authorized to draw only $220,000.00;

   b. that the M&T Bank Authorization had been withdrawn; and

   c. that there was no transaction with PMG.

61. Each and all of the representations were false.

62. The M&T Authorization expressly permitted PMG to draw the amount owed for the fuel taken by Universal, which totaled $667,516.86.

63. The M&T Bank Authorization was not withdrawn, nor was PMG given the requisite 15-day notice of any alleged withdrawal.

64. PMG's draw on the account did, in fact, involve transactions for the fuel taken from PMG.

## COUNT I – FRAUD
### *Against All Defendants*

65. PMG realleges and incorporates each of the foregoing allegations.

66. In connection with and as an inducement for PMG to enter into the business and credit relationship, Syed executed and submitted to PMG, with knowing assistance from Shamikh, the Credit Application containing multiple false representations and omissions of material fact, including, Syed's representation that he was not a guarantor for any other loans or credit agreements, Syed's representation that there were no judgments against him or Universal, and Syed's representation that neither he nor Shamikh ever did business under another name and/or in a different state.

10

67. Syed made these representations and omissions of material fact on behalf of, and to benefit, himself, Shamikh, and Universal.

68. Shamikh aided and abetted the fraud by submitting the Credit Application on behalf of his brother, Syed, by electronic mail on or about July 21, 2020, with knowledge that the representations in the application were false.

69. Shamikh knew that the misrepresentations and omissions of material fact were intended to induce PMG to extend credit to Universal and to enter into the business relationship.

70. Shamikh's submission of the Credit Application substantially assisted Syed in committing and furthering the fraud.

71. These misrepresentations and omissions of material fact were made with knowledge of their falsity and with the intent that PMG would rely on these misrepresentations and to induce PMG to enter into the business relationship with and extend credit to Universal.

72. PMG reasonably relied on the foregoing misrepresentations and omissions of material fact, to its detriment, and entered into the business relationship with and extended credit to Universal.

73. If PMG knew the truth about these representations and omissions of material fact, it would not have extended credit to or entered into the business relationship with Universal.

74. As a result of relying on these misrepresentations and omissions of material fact, PMG suffered harm and damages, including but not limited to nonpayment of the outstanding balance owed by Universal for the fuel that was unlawfully taken from the Gulf Terminal, and the loss of the time value of such amounts.

75. UGC substantially assisted the other Defendants in furthering the fraud, including by making payments on behalf of the other Defendants to continue the business and credit

11

relationship, enabling and continuing the ongoing fraudulent scheme, and preventing PMG from drawing payment from the M&T Bank account for the fuel that Defendants converted and stole at the Gulf Terminal.

76.     Defendants' acts were intentional, malicious, not privileged, reckless and wanton, and warrant punitive damages.

77.     Syed and Shamikh, in their individual capacity and as agents, corporate officers, and/or directors of Universal and UGC, directly and knowingly participated in, and aided and abetted, the fraudulent conduct as alleged herein.

## COUNT II – CIVIL CONSPIRACY
### *Against All Defendants*

78.     PMG realleges and incorporates each of the foregoing allegations.

79.     In connection with the fraud as alleged in Count I, Syed and Shamikh agreed and conspired amongst themselves, and those acting in concert with them, in a course of conduct to fraudulently induce PMG to extend credit to, and to enter and continue the business relationship with, Universal.

80.     The Kazmi Brothers agreed with each other, and the officers, directors, and/or employees of Universal, to submit the Credit Application to PMG—which they knew contained material misrepresentations and omissions of material fact—in order to obtain credit and do business with PMG, and to continue the ongoing fraudulent scheme.

81.     By way of example, Shamikh aided and abetted the fraud by submitting the Credit Application, as executed by Syed, to PMG by electronic mail on or about July 21, 2020.

82.     At least by January 2021, UGC joined the conspiracy when its officers, agents, directors, and employees agreed with the other Defendants to direct PMG to draw the amounts

owed by Universal for the fuel that Universal obtained on credit as a result of the Credit Application.

83.     Syed, Shamikh and Universal used UGC and its finances to further the fraud by directing PMG to use UGC's M&T Bank account in order to satisfy outstanding obligations, and to continue using credit and UGC's M&T Bank account for future fuel purchases, thus making UGC responsible for Defendants' continued ongoing fraudulent acts.

84.     UGC further acted to advance the conspiracy when it blocked PMG's attempts to draw from the M&T Bank account in August 2021, including by providing M&T with false representations concerning the parties' business relationship.

85.     As a direct and proximate cause of the conspiracy and acts in furtherance thereof, PMG suffered harm and damages, including but not limited to nonpayment of the outstanding balance owed by Universal for the fuel that was unlawfully taken from the Gulf Terminal, and the loss of the time value of such amounts.

86.     Defendants' acts were intentional, malicious, not privileged, reckless and wanton, and warrant punitive damages.

87.     Syed and Shamikh, in their individual capacity and as agents, corporate officers, and/or directors of Universal, directly and knowingly participated in, and aided and abetted, the fraudulent conduct as alleged herein.

## COUNT III – BREACH OF CONTRACT
### *Against Syed Kazmi*

88.     PMG realleges and incorporates each of the foregoing allegations.

89.     In conjunction with the Credit Application, ACH Authorization Forms, and the business relationship, PMG required a Guaranty Agreement.

90.     Syed agreed to provide the personal guaranty.  Syed executed the Guaranty Agreement, a copy of which is attached hereto as Exhibit "2".

91.     This Guaranty Agreement, executed by Syed on or about July 21, 2020, was submitted to PMG *via* electronic mail.

92.     Paragraph 1 of the Guaranty Agreement states, in pertinent part, that Syed guarantees to PMG,

> the prompt performance when due of all obligations of [Universal] to [PMG] whether now existing or hereafter incurred, whether direct, indirect, contingent or fixed, whether incurred as primary obligor, co-maker, endorser, or guarantor, whether otherwise guaranteed or secured, and whether on open account, evidenced by a written instrument or otherwise and whether arising in connection with any current or future business or location of [Universal], including without limitation any interest, penalties, and collection fees thereon. In the event any Guarantor does not pay any amount due under this Guaranty when due, the amount not paid shall bear interest at the greatest of the highest rate chargeable under the Obligations or 18% per annum until paid.

Ex. "2" at ¶ 1.

93.     Paragraph 3 of the Guaranty Agreement states that the Guarantor "represents and warrants that his Liability under this Guaranty is not contingent or conditional upon any other person signing this Guaranty or the obtaining or perfecting of any security for the Obligations, or any other condition precedent or subsequent." Ex. "2" at ¶ 3.

94.     Paragraph 5 of the Guaranty Agreement states that the Guarantor "shall, upon demand, pay all costs and expenses incurred by [PMG] in connection with the enforcement or collection of the obligations or the enforcement of this Guaranty, including attorney fees of 25% of total amount owed." Ex. "2" at ¶ 5.

95.     Paragraph 7 of the Guaranty Agreement states that "[e]ach of the Guarantors waives the benefit of any homestead exemption and notice of acceptance of any demand for payment as

14

to this Guaranty and also waives notice of any default in the Obligations or of action taken in connection therewith." Ex. "2" at ¶ 7.

96.     In August 2021, Universal took 231,246 gallons of fuel from the Gulf Terminal, for which it has since made only partial payment. There is a principal balance of $490,716.86 owed for the fuel.

97.     Universal failed to pay for the fuel it took from PMG, and continues to be in default of its obligations.

98.     PMG has demanded that Syed satisfy his obligations under the Guaranty Agreement, by paying Universal's outstanding obligations.

99.     Syed has breached his obligations under the Guaranty Agreement to satisfy Universal's debt to PMG.

100.    As a direct result of Syed's breach, PMG has suffered damages, including, but not limited to, the outstanding balance owed by Universal, the loss of the time value of such amount, plus interest recoverable under law.

### COUNT IV – NEGLIGENCE
*Against All Defendants*

101.    PMG realleges and incorporates each of the foregoing allegations.

102.    Defendants owed a duty of care to not mispresent or omit material facts to PMG.

103.    With regard to the misrepresentations and omissions of material facts pleaded herein and in Count I, said misrepresentations and omissions were, at a minimum, made negligently and without due care.

104.    Defendants could and did reasonably foresee that PMG would rely on the misrepresentations and omissions.

105.   PMG did reasonably rely on Defendants' misrepresentations and omissions, to its detriment.

106.   If PMG knew the truth about these representations and omissions, it would not have extended credit to or entered into a business relationship with Universal.

107.   UGC owed a duty to PMG to not omit material facts when it provided payment to PMG, which caused PMG to continue extending credit to Syed and Universal.

108.   UGC negligently and without due care did not inform PMG of the truth as to the misrepresentations and omissions as alleged in Count I.

109.   As a result of relying on misrepresentations and omissions, PMG suffered harm and damages, including but not limited to nonpayment of the outstanding balance owed by Universal for the fuel that was unlawfully taken from the Gulf Terminal, and the loss of the time value of such amount.

110.   Syed and Shamikh, in their individual capacity and as agents, corporate officers, and/or directors of Universal and UGC, participated in the aforesaid conduct relating to the misrepresentations and omissions alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Petroleum Marketing Group, Inc., respectfully requests that the Court grant relief and enter judgment for Plaintiff as follows:

a.   Awarding Plaintiff all damages recoverable under applicable law against each named defendant in each Count, including jointly and severally as allowed under applicable law, in excess of $150,000.00 exclusive of interest and costs, and including punitive damages under Counts I and II;

b.   Awarding Plaintiff all costs and expenses as recoverable under applicable law;

c.     Awarding Plaintiff prejudgment interest as recoverable under applicable law, including 18% *per annum* pursuant to the Guaranty Agreement;

d.     Awarding Plaintiff attorneys' fees and costs as recoverable under applicable law, including as provided by the Guaranty Agreement; and

e.     Awarding Plaintiff such other and additional relief as the Court finds proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

FREDERICK P. SANTARELLI
ZACHARY R. GREER (*pro hac vice application forthcoming*)
ELLIOTT GREENLEAF, P.C.
Union Meeting Corporate Center V
925 Harvest Drive
Blue Bell, PA  19422
(215) 977-1000
fpsantarelli@elliottgreenleaf.com
zrg@elliottgreenleaf.com
*Counsel for Plaintiff*
*Petroleum Marketing Group, Inc.*

DATE: November 16, 2023

17

# EXHIBIT "1"

# PETROLEUM MARKETING GROUP

**2359 Research Court, Woodbridge, VA 22192**
**Office (410) 259-2409   Fax (410) 357-5745**

PMG Sales Manager _____

## APPLICATION FOR COMMERCIAL CREDIT

Universal Property Services Inc
Exact Business Name

( )Proprietorship
( )Partnership
(Yes )Corporation
( )Limited Liability Company

in the state of }**nj**

Federal Agency ?   Y   **N**
State Agency ?   Y   **N**

Business Phone: _____

Trade Name (if different)
6 Lenn Road                Allentown, NJ        08501
**Physical Address**        City / State        Zip Code
_Same as above_____
**Billing Address**        City / State        Zip Code

E-Mail: __mgmt@upssites.com    Billing contact: __Shamikh__    Can we fax **or** e-mail invoices?  Yes ___  No ____

Billing E-mail:    Billing Phone: _215-278-4111    If yes, give e-mail **or** fax #: __mgmt@upssites.com_____
accounting@upssites.com
**Delivery Address**        Number & Street        City / State        Zip Code

How long at above address: _____
Number of years in business: _____    Type of Business: _____

BANK REFERENCES:
Name of Bank:   Td bank        Account No.: ████4590    Phone: (215)   946-2841
Name of Bank:   Bank of America    Account No.: ████4123`    Phone: (215)   639 6801

Trade References:  Please provide references covering the number of years stated in business.
1)   Arfa Ent.-15 years        Phone: (856)   486-0550
2)   First equity fiancne        Phone: (732   539-7800
3)   _____        Phone: ( )   _____
4)   _____        Phone: ( )   _____

Approximate Dollar Amount of Monthly Purchases On This Account: _____
Are you tax Exempt?   Yes ☐   No ☐   If yes, state tax ID no.: ___    Federal ID No.:   83-2290799

**Attach a current, audited financial statement.  If self-employed 3 years or less include 2 years of Federal Income Tax 1040 Forms.**

Name:   Syed Kazmi        Title:   CEO        SSN: ████
Home Address (No P.O. Boxes):   6 Lenn Road    No. of Years   3   Home Phone: ( )   609-672-1594
Allentown, NJ 08501        Percentage of Ownership   100   %

Name: _____        Title: _____        SSN: _____

Home Address (No P.O. Boxes): _____    No. of Years ____   Home Phone: ( ) _____
                        Percentage of Ownership ____ %

(Please provide information for any additional owners on a separate piece of paper and attach)

1.   Have you or any officers of the company ever done business under another name and/or in a different state?
Yes ☐ No ☒  If so, name and address:
2.   Have you or any officers of the company ever had any judgments or state or federal tax liens filed against you?
Yes ☐ No ☒  If so, name and address:
3.   Have you or any officers of the company ever filed personal or corporate bankruptcy in the last 7 years?
Yes ☐ No ☒  If so, name and address:
4.   Do you (individual), partnership or corporation own real estate?  Yes ☒ No ☐ If yes, list kind and location:
5.   Are you a Guarantor for other loans or credit obligations?  Yes ☐ No ☒ If yes, please furnish details:
6.   Have you or any of the officers of the company ever done business with Petroleum Marketing Group before? Yes ☐ No ☒
When and under what name?

I certify that the above information is correct and that, to the best of my knowledge, I have not omitted any material information concerning the credit history of Applicant or any owner or partner thereof. Applicant agrees to pay for all merchandise ordered by me or any agent of Applicant in accordance with quoted terms.  Applicant and Applicant's Owner agree to be bound by the Petroleum Marketing Group Account Conditions attached hereto.  Applicant hereby grants PETROLEUM MARKETING GROUP a purchase money security interest in all goods sold to it and any proceeds there from.  PETROLEUM MARKETING GROUP is further authorized to take all necessary action to perfect such purchase money security interest in accordance with applicable law.  The Federal Equal Credit Act prohibits creditors from discriminating against credit applicants on the basis of sex or marital status.  The federal agency which administers compliance with this law concerning this oil company is the Federal Trade Commission.

## PETROLEUM MARKETING GROUP ACCOUNT CONDITIONS

Page 1 of 2

PMG 001023

1.      **BINDING AGREEMENT** - This Agreement shall be between Applicant and Petroleum Marketing Group, which includes subsidiary corporations, partnerships, and joint ventures (hereinafter referred to as Petroleum Marketing Group). This Agreement shall inure to the benefit of the successors and assigns of Petroleum Marketing Group, and shall be binding upon Applicant's heirs, legatees, devisees, personal representatives, successors and assigns.

2.      **AUTHORIZATION FOR CREDIT REVIEW** – You authorize Petroleum Marketing Group to obtain any and all information it deems necessary from any and all sources or references listed on this Credit Application, and from any other credit bureaus, your creditors, trade references, banks or other financial institutions and you authorize such entities to supply Petroleum Marketing Group such information as Petroleum Marketing Group deems necessary to assist it in its consideration of the Credit Application.

3.      **PAYMENT TERMS** - Applicant agrees to pay in full the invoice and/or contract price of all purchases now or hereafter made from Petroleum Marketing Group promptly when due according to the terms set forth on each invoice and/or contract and/or billing memo or if no terms are set forth, terms are due upon receipt . If such total price is not paid in full on or before the due date, Applicant agrees to pay a late payment charge on the unpaid delinquent balance calculated at the rate of the lesser of: (a) one and one-half percent (1 ½ %) per month unless a different rate is otherwise indicated on a current invoice, in which case such indicated rate would prevail or (b) the highest rate allowed by law. If Applicant should fail to fulfill any of its obligations under this Agreement, or if Petroleum Marketing Group, in good faith deems itself insecure because the prospect of payment is impaired, or the prospect of performance of any provision of the Agreement is impaired, or if a default occurs for any other reason provided in this Agreement, then Petroleum Marketing Group, at its option and without notice, may declare the entire unpaid balance owed by Applicant under this Agreement to be immediately due and payable, terminate the credit privileges of Applicant under this Agreement, exercise its rights as a secured party, or any combination of the foregoing. Applicant agrees to pay all costs and expenses incurred by Petroleum Marketing Group in collecting the amounts owed by the Applicant under this Agreement, including all attorney's fees and court costs actually incurred by Petroleum Marketing Group.

4.      **DEFAULT** - The occurrence of any of the following events shall constitute a default under this Agreement (a) Applicant fails to fulfill any obligation of this Agreement or to perform, or rectify the breach of, any warranty, agreement, or other undertaking by Applicant; (b) Applicant or any guarantor of Applicant's indebtedness under this Agreement, dies, terminates existence, abandons its business, becomes insolvent, bankrupt, becomes the subject of bankruptcy, receivership, insolvency, or similar proceedings, or makes an assignment for the benefit of creditors; (c) any information or other representation now or hereafter made or furnished to Petroleum Marketing Group by Applicant's request or instruction is, or is believed in good faith by Petroleum Marketing Group to be inaccurate, incomplete, or false in any material respect; (d) Applicant violates or breaches any provision of this Agreement; (e) any collateral which is security for Applicant's indebtedness under this Agreement is lost, suffers material damages or destruction, is levied upon, becomes subject to a receivership, or cannot be located within five days after Petroleum Marketing Group demands to inspect the same; (f) any other event which causes Petroleum Marketing Group, in good faith, to deem itself insecure or to believe that the prospect of performance of any provision of the Agreement by Applicant is impaired.

5.      **WAIVER** - Petroleum Marketing Group may, at its option, permit Applicant to remedy any default under this Agreement without waiving the default so remedied or any other subsequent or prior default by Applicant.

6.      **ACCURACY OF INFORMATION** -Applicant certifies that any and all information now or hereafter supplied to Petroleum Marketing Group by Applicant, or at Applicant's request or instruction, is both accurate and complete, and Applicant will, upon request, establish the accuracy and completeness of any such information. Applicant shall promptly notify Petroleum Marketing Group of any change in such information supplied, and of any change in Applicant's residence, primary place of business or mailing address. Applicant shall promptly notify Petroleum Marketing Group if Applicant should change its name or begin to do business under any other name. Applicant shall promptly notify Petroleum Marketing Group by certified mail if it should change its entity status at any time subsequent to the date of this application.

7.      **CORPORATE/ENTITY AUTHORITY AND LIABILITY** - Applicant warrants and represents that it has authority to enter into this Agreement and that any person signing this Agreement has been duly authorized to execute this Agreement for and on behalf of Applicant. If Applicant is not yet a legally organized corporation or limited liability company, Applicant acknowledges that Petroleum Marketing Group is relying upon the credit worthiness and financial ability of the owner or owners of the Applicant to discharge any and all obligations of Applicant to Petroleum Marketing Group. If Applicant, subsequent to this Application, incorporates, or forms a limited liability company to conduct its business, the owner or owners shall be jointly and severally liable to Petroleum Marketing Group for any and all indebtedness to Petroleum Marketing Group, whether existing prior to incorporation and/or formation or subsequently incurred.

8.      **PRODUCT CLAIMS** – Applicant agrees to notify sales, quality control and credit departments in writing by certified mail within five (5) business days of original date of any product disputes and non performance claims regarding failure to meet the written guaranty provision or bid specifications. Applicant agrees to waive any right to claim or dispute offsets or back charges if the claim is not made according to the above stated time limits.

9.      **ASSURANCE OF NO DIVERSION OF FUNDS** - Applicant hereby agrees (a) to pay Petroleum Marketing Group on a timely basis for product (inventory) sold to it by Petroleum Marketing Group (b) not to misappropriate or waste the inventory or transfer the inventory other than for fair value in the ordinary course of business or to take any fraudulent actions, (c) to maintain in full force and effect hazard insurance coverage on the inventory and (d) not to convert, misapply or commingle proceeds from the sale of inventory in such manner that proceeds are not available on a timely basis for the electronic transfer of funds, or other form of payment, to Petroleum Marketing Group in the ordinary course of business. As an inducement for Petroleum Marketing Group to extend credit to the Applicant, Applicant's Owner hereby agrees to indemnify and save harmless Petroleum Marketing Group against any and all claims, damages, losses, costs and expenses, including reasonable attorney's fees, suffered or incurred by Petroleum Marketing Group as a result of any breach of the Applicant of these obligations. Applicant's Owner waives all notices and surety defenses and agrees that Petroleum Marketing Group need not pursue the Applicant before pursuing Applicant's Owner. This undertaking shall be binding upon the heirs, personal representatives, successors and assigns of Applicant and Applicant's Owner, and inure to the benefit of Petroleum Marketing Group successors and assigns.

10.     **TERMS** - Commercial Station and Fleet Pump Accounts: Petroleum Marketing Group invoices all accounts at the end of each month. Payment terms are stated on the invoice. Bulk Purchases: Petroleum Marketing Group bills bulk and other purchases by invoice. Invoices are mailed the day following delivery and charges are due according to the terms stated on the invoice.

11.     **ADDITIONAL PROVISIONS** -The rights and remedies of Petroleum Marketing Group stated in this Agreement are cumulative and are in addition to any other rights or remedies provided by law. This Agreement shall not be binding upon or inure to the benefit of Applicant until executed by an authorized officer or agent of Petroleum Marketing Group.

**Applicant Name (Print)** _____Syed Kazmi_____     **Title** _____President_____

**Signature** _____/s/ Syed Kazmi_____     **Date**_____7-20-20_____

**Applicant Name (Print)** _____     **Title** _____

**Signature** _____     **Date**_____

**Witness** _____

Page 2 of 2

PMG 00102

# EXHIBIT "2"

# *PETROLEUM MARKETING GROUP*

<div style="float:right; border:1px solid black; padding:4px;">**Page 1 of 2**</div>

THIS GUARANTY is made this __21___ day of__*July*_____, by and between the undersigned (individually "Guarantor" and collectively Guarantors") and **PETROLEUM MARKETING GROUP** with respect to certain present and future obligations of Universal Property Services Inc ___ ("Buyer") which wishes to establish a line of credit (the "Agreement") for the purchase of petroleum and other products from **PETROLEUM MARKETING GROUP** which has required additional assurances of Buyer's payment as a condition of entering into the Agreement.

In consideration of good and valuable consideration and in order to induce **PETROLEUM MARKETING GROUP** to enter into the Agreement, the parties agree as follows:

1.  **Guaranty.**  Each of the Guarantors jointly and severally guarantee to **PETROLEUM MARKETING GROUP** the prompt performance when due of all obligations of Buyer to **PETROLEUM MARKETING GROUP** whether now existing or hereafter incurred, whether direct, indirect, contingent or fixed, whether incurred as primary obligor, co-maker, endorser, or guarantor, whether otherwise guaranteed or secured, and whether on open account, evidenced by a written instrument or otherwise and whether arising in connection with any current or future business or location of Buyer (collectively the "Obligations"), including without limitation any interest, penalties, and collection fees thereon.  In the event any Guarantor does not pay any amount due under this Guaranty when due, the amount not paid shall bear interest at the greatest of the highest rate chargeable under the Obligations or **18%** per annum until paid.

2.  **Nature of Guaranty**. This is a continuing unconditional Guaranty, and the liability of each of the Guarantors to **PETROLEUM MARKETING GROUP** shall not be limited to a proportionate part of the total liability of the Buyer to **PETROLEUM MARKETING GROUP.**  This is a guaranty of payment and not of collection, and each of the Guarantors waives any right to require that any action be brought against the Buyer, or any other Guarantor, or to require that resort be had to any security, or any other person, and agrees that **PETROLEUM MARKETING GROUP** assumes no responsibility for the validity or enforceability of any security for the Obligations have been paid in full.

3.  **Conditions Precedent**. Each of the Guarantors represents and warrants that his Liability under this Guaranty is not contingent or conditional upon any other person signing this Guaranty or the obtaining or perfecting of any security for the Obligations, or any other condition precedent or subsequent.

4.  **Changes Affecting the Obligations**.  **PETROLEUM MARKETING GROUP** may, from time to time, either before or after death of any of the Guarantors, to any default by the Buyer, with or without further notice to any of the Guarantors, renew or extend the time of payment of the Obligations, and allow any indulgences, modifications, or compromises in connection therewith, and may change, renew, extend, surrender, impair, or compromise in whole or in part any security at any time held by or available to **PETROLEUM MARKETING GROUP** for the Obligations or for any waive, release, extend or modify the rights of any of the Guarantors, without impairing the enforceability of this Guaranty.  The death, disability or discharge in bankruptcy of the Buyer or any of he Guarantors shall not affect the Liability of any remaining Guarantors.

5.  **Cost of Collection**. Each of the Guarantors shall, upon demand, pay all costs and expenses incurred by **PETROLEUM MARKETING GROUP** in connection with the enforcement or collection of the obligations or the enforcement of this Guaranty, including attorney fees of **25%** of total amount owed.

6. **Reinstatement**, Even if the Obligations are paid in full and this Guaranty is returned to the Guarantors, the Guaranty shall continue in full force and effect with respect to any amounts that **PETROLEUM MARKETING GROUP** may ever be required to repay under any bankruptcy or insolvency laws.

7. **Waivers of Homestead, Notice**. Each of the Guarantors waives the benefit of any homestead exemption and notice of acceptance of any demand for payment as to this Guaranty and also waives notice of any default in the Obligations or of action taken in connection therewith. To the extent any notice may not be legally waived, each Guarantor appoints the Buyer his or her attorney-in-fact for the delivery of any notice.

8. **Delays, Waivers by PETROLEUM MARKETING GROUP**  No delay or failure on the part of **PETROLEUM MARKETING GROUP** in exercising any rights under this Guaranty or the Obligations shall operate as a waiver such rights; no notice to or demand on the Guarantors shall be a waiver of the any obligations of the Guarantors or of the right of **PETROLEUM MARKETING GROUP** to take further action without notice or demand.

9. **Modification. Waiver of the Guaranty**.  No modification or waiver of the provisions of this Guaranty, including the provision of this paragraph, shall be effective unless in writing and signed by **PETROLEUM MARKETING GROUP**;  nor shall any waiver be applicable except in the specific instance for which it is given.

10. **Binding Effect**. This Guaranty shall inure to the benefit of, and be binding upon, all parties hereto, their successors, assigns and legal representatives.

11. **Sources of Information**. The Guarantors warrant that they have adequate means to obtain from the Buyer, now and on a continuing basis, all necessary and desirable information concerning the financial condition of the Buyer, and they are not relying on **PETROLEUM MARKETING GROUP** to provide such information, either now or in the future.

12. **Modifications to Agreement**. **PETROLEUM MARKETING GROUP** may make any modifications and additions to the Agreement, and the Obligations, including without limitation, extending the term of the Agreement, increasing or decreasing payments under the Agreement, or allowing Buyer to assign or delegate its duties under the

PMG 001025

Page 2 of 2

Agreement, without releasing any Guarantor or in any way limiting the liability of any Guarantor, this Guaranty expressly extending to such modifications and extensions.

13. **Interpretation**.  All questions regarding the execution, interpretation, and enforcement of this Guaranty shall be resolved according to the **Laws of the State of Virginia**.

14. **Venue**. Regardless of what venue would otherwise be permissive or required, the parties stipulate that all actions arising under or affecting this Guaranty shall be brought in the **Circuit or General District Courts of the County of Prince William**, the parties agreeing that such forum is mutually convenient and bears a reasonable relationship to this Guaranty.

15. **Headings**. The headings contained in this Guaranty are for the convenience of the parties only, are not a part of the substantive agreement between the parties, shall not be used in the interpretation of any of the provisions of this Guaranty.

16. **Number and Gender**. Whenever used in this Guaranty, the singular shall include the plural, the plural shall include the singular, and the use of any gender shall include any other gender, as the circumstances may require.

17. **Severability**. If any provision of this Guaranty is determined to be unenforceable, the remaining provisions shall be construed and enforced as if such unenforceable provision had not been contained in this Guaranty.

18. **Entire Agreement**. This Guaranty is intended by the parties to be a complete statement of their agreements concerning this Guaranty, replacing all prior negotiations, offers, representations, warranties, and agreements. No course of dealing between the parties, no usage of trade, and no parole or extrinsic evidence of any nature shall be used to supplement or modify any of the terms of this Guaranty.

_____Syed Kazmi_____    _____
NAME                                                        NAME

_____/s/ Syed Kazmi_____    _____
SIGNATURE                                           SIGNATURE

_6 lenn rd. Allentown, Nj 08501_____    _____
ADDRESS                                                 ADDRESS

_____609 672 1594_____    _____
PHONE NUMBER                                  PHONE NUMBER

_____████████_____    _____
SOCIAL SECURITY#                              SOCIAL SECURITY #

_____04-12-1989_____    _____
DATE                                                        DATE

==========================================================

_____    _____
NAME                                                        NAME

_____    _____
SIGNATURE                                           SIGNATURE

_____    _____
ADDRESS                                                 ADDRESS

_____    _____
PHONE NUMBER                                  PHONE NUMBER

_____    _____
SOCIAL SECURITY#                              SOCIAL SECURITY #

_____    _____
DATE                                                        DATE

Notarize Here

==========================================================

_____    _____
WITNESSED BY (PRINT)                        DATE

_____
SIGNATURE

**2359 Research Court   •   Woodbridge, VA  22192   •   Phone (703) 494-5800   •   Fax (410) 510-1971**

PMG 00102